**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JAMES E. HERMANSON, | Case No. 3:17-cv-00721-HDM-CLB |
| Petitioner, | |
| v. | **ORDER** |
| ISIDRO BACA,[1] et al., | |
| Respondents. | |

Petitioner James E. Hermanson has filed a habeas petition pursuant to 28 U.S.C. § 2254 challenging his state-court conviction, pursuant to a guilty plea, of sexual assault of a child under sixteen. (ECF No. 21). The second amended petition, filed by counsel, is before the Court for adjudication of the merits. Respondents have answered (ECF No. 53), and Hermanson has replied. (ECF No. 54).

For the reasons discussed below, the Court denies Hermanson's habeas petition, denies him a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

**I.    BACKGROUND[2]**

On March 16, 2013, Hermanson was arrested after his minor

---

[1] According to the state corrections department's inmate locator page, Hermanson is incarcerated at Northern Nevada Correctional Center. The department's website reflects that Fernandies Frazier is the warden of that facility. At the end of this order, the Court directs the Clerk of the Court to substitute Fernandies Frazier for Respondent Isidro Baca under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The Court makes no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify that the Court overlooked it in considering Hermanson's claims.

stepdaughter, M.M., disclosed to law enforcement that he had engaged in "[i]nappropriate sexual conduct" with her. (ECF No. 15-1 at 104-06, 108-09). When officers arrived at his house to arrest him, Hermanson was unconscious. (*Id.* at 13). Feeling "severely depressed" about M.M.'s allegations, Hermanson had attempted to commit suicide by overdosing on "psych meds, pain pills, and Flexeril." (*Id.* at 12-13, 15, 32). The arresting officers woke him up and took him to a Yerington hospital, where he stayed before being transported by Care Flight to a hospital in Reno. (*Id.* at 14).

Following his hospital stays, Hermanson was taken to the Lyon County Jail. (*Id.*) There, Hermanson tried to commit suicide again, first by banging his head against a wall and then by eating the "plastic on [his] mattress." (*Id.* at 15-16). Hermanson was taken to a hospital, where a doctor filled out a form "committing [him] to the mental hospital in Reno." (*Id.* at 16). Instead of taking him to the "mental hospital," however, the escorting officer took him back to the jail. (*Id.*)

On the evening of March 18, 2013, law enforcement interviewed Hermanson at the jail. (*Id.* at 109-12). Following the reading of his *Miranda* rights, Hermanson admitted that he had touched M.M.'s clitoris "one time" because "she asked [him] to." (*Id.* at 125-28). Hermanson acknowledged that this admission "was enough to put [him] in prison" for "lewdness." (*Id.* at 128).

Two days later, on March 20, 2013, Hermanson was charged with one count of lewdness with a child under fourteen, specifically M.M. (ECF No. 14-2). On May 1, 2013, Hermanson was charged with an additional count of sexual assault of a child under sixteen. (ECF

No. 14-3). This new charge related to allegations that Hermanson had engaged in sexual conduct with K.H., his niece. (*Id.* at 2; ECF No. 15-1 at 68). The amended criminal complaint, which contained both counts, noted that Hermanson had previously been convicted of lewdness with a child under fourteen. (ECF No. 14-3 at 1-2). As a result of this prior conviction, Hermanson faced a potential sentence of life without the possibility of parole. *See* NRS § 200.366(4) (West 2013); NRS § 201.230(3) (West 2013).

On July 1, 2013, Hermanson pled guilty to one count of sexual assault of a child under sixteen. (ECF No. 14-7). In exchange, the State agreed to (i) drop the charge of lewdness with a child under fourteen, and (ii) not seek a sentence of life without the possibility of parole for the remaining count. (*Id.* at 1; ECF No. 15-1 at 21-22). Instead, Hermanson would receive a sentence of life with the possibility of parole after twenty-five years. (ECF No. 14-7 at 2). Following the entry of his guilty plea, Hermanson was sentenced to life with parole eligibility after twenty-five years. (ECF No. 14-9).

Hermanson did not pursue a direct appeal. Instead, he sought habeas relief in Nevada state court. (ECF No. 14-10). Counsel was appointed, and Hermanson filed a supplemental petition on April 15, 2015. (ECF No. 14-16). Following an evidentiary hearing, the state district court denied Hermanson's petition. (ECF No. 15-2). The Nevada Court of Appeals affirmed the denial of the petition on January 19, 2017. (ECF No. 16-7). While his appeal was pending, Hermanson filed another state habeas petition, which was subsequently denied as successive. (ECF No. 16-2; ECF No. 16-11).

This Court received Hermanson's *pro se* federal habeas

petition on December 14, 2017. (ECF No. 1). Following the appointment of counsel, Hermanson filed a first amended petition and then a second amended petition. (ECF Nos. 13, 21). Respondents moved to dismiss Grounds 2, 3, 4, and 5 of the second amended petition. (ECF No. 31). This Court held that Ground 3 was unexhausted, and that Grounds 2, 4, and 5 were technically exhausted but procedurally defaulted. (ECF No. 43). The Court allowed Hermanson to return to state court to exhaust Ground 3 and agreed to defer consideration of whether Hermanson could excuse the default of Grounds 2, 4, and 5 until the merits disposition. (*Id.* at 7; ECF No. 45).

This action was stayed while Hermanson exhausted Ground 3, which alleged that his right to due process was violated because he was sentenced without a presentence investigation report ("PSI"). (ECF No. 45). Hermanson returned to state district court and filed a motion to correct an illegal sentence. (ECF No. 51-2). The district court denied the motion, and the Nevada Supreme Court affirmed on October 18, 2021. (ECF No. 51-2; ECF No. 51-7). Following the completion of the state-court proceedings, the Court reopened this action and ordered merits briefing on the second amended petition. (ECF No. 52).

## II.   LEGAL STANDARDS

### A.   Review under the Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review generally applicable in habeas corpus cases:

An application for a writ of habeas corpus on behalf of

a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state-court decision is contrary to established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state-court decision is an unreasonable application of established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as "difficult to meet" and a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

**B.   Standard for Evaluating an Ineffective-Assistance Claim**

In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring a petitioner to demonstrate that (i) the attorney's "representation fell below an objective standard of reasonableness," and (ii) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Courts considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Moreover, to establish prejudice under *Strickland*, it is not enough for the petitioner "to show that the errors had some

conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. When the ineffective-assistance claim challenges a guilty plea, the *Strickland* prejudice prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Under *Hill*, a challenge to the voluntariness of a plea may be based upon a claim of ineffective assistance of counsel. As the Supreme Court observed:

> For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" [the petitioner] by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise [the petitioner] of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . As we explained in *Strickland v. Washington*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker."

*Id.* at 59-60 (citing *Strickland*, 466 U.S. at 695).

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly

deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

**III. ANALYSIS**

   **A.   Ground 1(B)[3]**

In Ground 1(B), Hermanson alleges that his counsel provided ineffective assistance by failing to move to suppress the statements he made to law enforcement after his arrest. (ECF No. 21 at 13). Hermanson points to several "red flags" that allegedly "rais[e] concerns [about] the voluntariness" of his statements. (*Id.*) The "red flags" include (i) Hermanson's "severe mental health breakdown," which culminated in multiple suicide attempts before and after the interview; (ii) Hermanson's lack of "adequate sleep" and his inability to "keep food down" around the time of the interview; and (iii) the "bias[ ]" of the interviewer, Detective McNeil, whose daughter had allegedly received a tattoo from Hermanson several years earlier. (ECF No. 54 at 11-14). Hermanson argues that, had his counsel moved to suppress his statements,

---

[3] The Court addresses Ground 1(B) before Ground 1(A) because the former claim provides background information relevant to the latter.

there is "more than a reasonability probability" that the motion would have been granted. (ECF No. 21 at 14). And, if the statements had been suppressed, Hermanson claims he "most certainly would have gone to trial." (*Id.*)

### 1.   Background Information

Detective McNeil interviewed Hermanson at the Lyon County Jail on the evening of March 18, 2013. (ECF No. 15-1 at 109-12). At the state postconviction evidentiary hearing, McNeil testified that Hermanson was wearing a "suicide gown" during the interview because he had recently tried to kill himself. (*Id.* at 119). Nevertheless, according to McNeil, Hermanson "understood what [McNeil] was saying" and "asking." (*Id.*) McNeil began the interview by advising Hermanson of his *Miranda* rights. (*Id.* at 116-17). Hermanson agreed to answer McNeil's questions. (*Id.*) The two then discussed Hermanson's first suicide attempt and his current state of mind:

> DETECTIVE MCNEIL: And you're in a suicide gown because of what happened when we -- when you were found?
>
> HERMANSON: Uh-hum.
>
> DETECTIVE MCNEIL: You know, I guess they took you, Care Flighted you from Reno to South Lyon.
>
> HERMANSON: Reno.
>
> DETECTIVE MCNEIL: No. They took you to Reno to make sure you're okay. Are you feeling okay right now?
>
> HERMANSON: I'm as good as can be, I guess.
>
> DETECTIVE MCNEIL: I mean, you're still not messed up from --
>
> HERMANSON: No.
>
> DETECTIVE MCNEIL: -- the pills you overdosed on or anything like that?
>
> HERMANSON: No. I'm hurting because always my back, they won't give me my pain meds.
>
> DETECTIVE MCNEIL: Okay. That's -- what I'm asking is you said -- you're coherent --

HERMANSON: Yes.

DETECTIVE MCNEIL: -- and you understand everything I'm saying?

HERMANSON: Yeah.

DETECTIVE MCNEIL: And you -- and there is no side affects [*sic*] for the medication or anything like that right now, other than the fact you'd like to get some of your pain medication -- pain meds?

HERMANSON: Exactly.

DETECTIVE MCNEIL: That's a jail issue.

HERMANSON: Yes. And that's fine.

DETECTIVE MCNEIL: All right.

(*Id.* at 119-20).

McNeil proceeded to question Hermanson about the allegations concerning M.M.:

DETECTIVE MCNEIL: I'm going to ask you very simply one question: Did you touch [M.M.'s] private area?

HERMANSON: Okay.

DETECTIVE MCNEIL: Do you understand what private area is?

HERMANSON: Uh-hum.

DETECTIVE MCNEIL: What private area?

HERMANSON: Her vagina.

DETECTIVE MCNEIL: Okay. Her vagina. Did you touch it?

HERMANSON: Yes, I did, one time. Because she asked me to.

DETECTIVE MCNEIL: Tell me about that.

HERMANSON: The only time I ever did because she asked me where the ball that [K.H.] told her about was. And I said it's right there. That was all I ever did. That's all I ever touched. I never did anything else.

(*Id.* at 125).

Hermanson elaborated on the incident, claiming that in the summer of 2012, M.M. had been discussing masturbation with him, and that she had pulled her pants down and asked him to "show [him] where the ball is that everybody's talking about." (*Id.* at 126). At that point, Hermanson said, he "reached down and touched it

like that. And I said, 'It's right there, that's where it is.' And I said, 'That's enough.' I walked away." (*Id.*) Hermanson subsequently clarified that by "ball," he was referring to the clitoris. (*Id.* at 126-27). He also acknowledged that his admission "was enough to put [him] in prison" for "lewdness." (*Id.* at 128).

### 2.   State-Court Determination

In affirming the denial of Hermanson's state habeas petition, the Nevada Court of Appeals held:

> First, Hermanson argued his counsel was ineffective for failing to file a motion to suppress the inculpatory statements he made to a sheriff's deputy. Hermanson alleged his statements were not voluntarily made because he had recently attempted suicide, overdosed on medication, used illegal drugs, did not receive adequate sleep, and suffered from further mental health and physical issues. Hermanson failed to demonstrate his counsel's performance was deficient or resulting prejudice.

> "A confession is admissible only if it is made freely and voluntarily" and "must be the product of a rational intellect and a free will." *Passama v. State*, 103 Nev. 212, 213-14, 735 P.2d 321, 322 (1987) (internal quotation marks omitted). When reviewing whether a confession was made voluntarily, "[v]oluntariness must be determined by reviewing the totality of the circumstances." *Gonzales v. State*, 131 Nev. __, __, 354 P.3d 654, 658 (Nev. App. 2015).

> The district court conducted an evidentiary hearing and Hermanson's counsel testified. Counsel testified he had reviewed Hermanson's statement and did not consider filing a motion to suppress because it was clear to him Hermanson did not have any difficulty understanding the discussion with the deputy. A review of the record reveals Hermanson's counsel's performance did not fall below an objective standard of reasonableness in this regard. *See id.; see also Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989) (tactical decisions of counsel "are virtually unchallengeable absent extraordinary circumstances."). The district court further concluded Hermanson's testimony, in which he asserted he did not comprehend the deputy's questions, to be incredible, particularly in light of Hermanson's detailed description during the interrogation of his interactions with the victim. The district court's conclusions in this regard are supported by substantial evidence.

Further, the circumstances surrounding Hermanson's statement demonstrate it was voluntarily given. During the interrogation, the sheriff's deputy advised Hermanson of his *Miranda* rights and Hermanson agreed to talk with the deputy. The deputy questioned Hermanson to ensure he understood the conversation, and Hermanson responded that he felt fine, he had no side effects from any medication, and his only issue stemmed from back pain due to a lack of pain medication while housed in the county jail. Hermanson then explained to the deputy that he had touched the victim's vagina in response to the victim's anatomy questions. Hermanson acknowledged his actions were sufficient for the authorities to detain him. Under these circumstances, Hermanson failed to demonstrate a reasonable probability he would have refused to plead guilty and would have proceeded to trial had counsel filed a motion to suppress his statements. Therefore the district court did not err in denying this claim.

(ECF No. 16-7 at 2-3).

### 3. Conclusion

The Nevada Court of Appeals' rejection of this claim was a reasonable application of clearly established federal law and was not based on an unreasonable application of the facts. Where, as here, an ineffective-assistance claim rests on counsel's failure to file a motion to suppress evidence on constitutional grounds, a petitioner must establish that (i) such a motion had merit and (ii) there was a reasonable probability that, but for counsel's failure to file the meritorious motion to suppress, the petitioner "would not have pleaded guilty and would have insisted on going to trial." *Premo v. Moore*, 562 U.S. 115, 131-32 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). The Nevada Court of Appeals reasonably concluded that (i) the circumstances surrounding Hermanson's statements show that they were voluntarily given, and (ii) Hermanson's counsel was therefore not ineffective for failing to move to suppress the statements.

The admission into evidence at trial of an involuntary

confession violates a defendant's right to due process under the Fourteenth Amendment. *Lego v. Twomey*, 404 U.S. 477, 478 (1972); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession"); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). A confession is voluntary only if it is the product of rational intellect and free will. *Blackburn v. State of Alabama*, 361 U.S. 199, 208 (1960). "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (internal quotation marks omitted).

Whether a confession is involuntary must be analyzed within the "totality of [the] circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). Factors to be considered include the degree of police coercion; the length, location, and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age. *Id.* at 693-94. "This is a fact-based analysis that inherently allows for a wide range of reasonable application, and because the general standard requires a case-by-case analysis, federal courts must provide even more leeway under AEDPA in evaluating whether a rule application was unreasonable." *Reno v. Davis*, 46 F.4th 821, 836 (9th Cir. 2022) (internal quotation marks and citation omitted).

Hermanson contends that his statements were involuntary because, at the time of the interview, he was sleep-deprived, had not eaten much recently, and was undergoing a "severe mental health breakdown." (ECF No. 54 at 11-14). During the interview, however, Hermanson stated that he was no longer "messed up" from the pills he had overdosed on during his first suicide attempt. (ECF No. 15-1 at 119-20). Hermanson also made clear that he was "coherent" and understood "everything [McNeil] was saying." (*Id.*) Indeed, the only medical issue Hermanson identified was his back pain, complaining that the jail would not "give [him] [his] pain meds." (*Id.*) Moreover, Hermanson gave a detailed, coherent account of the incident with M.M., claiming that he had touched her clitoris during the summer of 2012 in response to her anatomy questions. (*Id.* at 125-27). And while Hermanson contends that Detective McNeil was "biased" because he had given McNeil's daughter a tattoo several years earlier, he points to no evidence that this fact influenced McNeil's handling of the interview. (ECF No. 54 at 11-12).

Considering the circumstances surrounding the interview, the Nevada Court of Appeals concluded that Hermanson's statements were voluntarily given. This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 786-87. And, having found that Hermanson's statements were voluntary, the Nevada Court of Appeals reasonably concluded that his counsel was not ineffective for failing to move to suppress those statements. Thus, Hermanson is not entitled to relief on Ground 1(B).

**B.   Ground 1(A)**

In Ground 1(A), Hermanson contends that his counsel was ineffective for failing to conduct an adequate investigation. (ECF No. 21 at 10). Hermanson claims that he "provided counsel with the names of numerous people who could have provided exculpatory information on [his] behalf." (*Id.*) But, instead of listening to these witnesses when they visited him, counsel "simply play[ed] them Hermanson's alleged statement incriminating himself." (*Id.*) According to Hermanson, had his counsel performed "this basic investigation" and uncovered the allegedly exculpatory information, he would have gone to trial rather than pleading guilty. (*Id.* at 11).

**1.   Background Information**

At the state postconviction evidentiary hearing, several witnesses described the exculpatory information that Hermanson's counsel allegedly ignored. Cecilia Gilland, a friend of Hermanson, testified that, approximately one month before K.H. accused Hermanson of sexual misconduct, K.H. had said that "she knew that [Hermanson] would never hurt her. That she was strong. And he had never hurt her, and that he never could." (ECF No. 15-1 at 60-61). William Gilland, Cecilia's husband, testified that approximately one month after Hermanson's arrest on allegations of molesting M.M., K.H. had said "there is no way that [Hermanson] would ever touch me or ever could touch me." (*Id.* at 70-72). T.H., Hermanson's son, testified that M.M.'s mother (Jody Martin) "would have [him and] M.M. have sex in front of Jody's party friends." (*Id.* at 99).

Hermanson's counsel stated at the evidentiary hearing that he had spoken to Cecilia Gilland, Jody Martin, and several other

witnesses, but that he did not find the information they provided to be "very helpful in this case." (*Id.* at 182-84). He also testified that the only written statement he received was from Raymond McClory, who claimed that "didn't see Mr. Hermanson ever do anything with the kids" and "didn't believe they were ever left alone with him." (*Id.* at 171). Hermanson's counsel discounted this statement because "everybody else"—including Jody Martin—said that "at times" Hermanson was "left alone" with the victims. (*Id.*)

Hermanson's counsel acknowledged that Cecilia Gilland had mentioned her conversation with K.H. (*Id.* at 183-84). He explained, however, that by the time Gilland came to him with this information, Hermanson had already told him he wanted to plead guilty. (*Id.* at 184). Counsel testified that, because of his prior conviction for lewdness with a minor, Hermanson "was looking at life without [the possibility of parole]," and that "to limit his liability," he chose to take a plea deal that included a sentence of life with parole eligibility after twenty-five years. (*Id.*) Counsel also stated that he had talked with Hermanson about the latter's statements to law enforcement, telling him that the confession "presented huge problems" because M.M. was "a 12-year-old girl and he's an adult," and a jury "may not be very forgiving in these kinds of cases." (*Id.* at 166). At the time of his guilty plea, Hermanson was forty years old. (ECF No. 17-1 at 1).

### 2.   State-Court Determination

In affirming the denial of Hermanson's state habeas petition, the Nevada Court of Appeals held:

> Second, Hermanson argued his counsel was ineffective for failing to investigate and interview witnesses. Hermanson alleged he provided names of

witnesses he believed would aid his case, but his counsel refused to take statements from those witnesses. Hermanson failed to demonstrate his counsel's performance was deficient or resulting prejudice. At the evidentiary hearing, counsel stated he had discussed the case with witnesses Hermanson had believed would provide favorable evidence, but those persons had not actually provided anything helpful to the defense. The district court concluded counsel's testimony was credible and substantial evidence supports that conclusion.

Hermanson also presented the testimony of many of these witnesses at the evidentiary hearing, but the district court concluded that none of those witnesses provided testimony that was exculpatory in nature. Substantial evidence supports the district court's conclusion in this regard. In addition, the record reveals Hermanson admitted to touching a victim's genitals and, had Hermanson rejected the State's plea offer and proceeded to trial, he would have faced a sentence of life without the possibility of parole as he had previously been convicted of a sexual offense against a child. [FN 3]. *See* NRS 200.366(4). Under these circumstances, Hermanson did not demonstrate a reasonable probability he would have refused to plead guilty and would have proceeded to trial had counsel conducted further investigation or interviews of witnesses. Therefore, the district court did not err in denying this claim.

> [FN 3] We note Hermanson was originally charged with lewdness with a child under the age of 14 and sexual assault of a child under the age of 16.

(ECF No. 16-7 at 3-4).

### 3.   Conclusion

The Nevada Court of Appeals' rejection of this claim was a reasonable application of clearly established federal law and was not based on an unreasonable application of the facts. To establish the prejudice prong of his ineffective-assistance claim, Hermanson "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). "This assessment, in turn, will depend in large part on a prediction whether the [allegedly exculpatory] evidence likely would have changed the outcome of a trial." *Hill*, 474 U.S. at 59. The prejudice assessment is an

objective one made "without regard for the idiosyncrasies of the particular decisionmaker." *Id.* at 59-60 (internal quotation marks and citation omitted).

As the Nevada Court of Appeals explained, Hermanson was originally charged with one count of lewdness with a child under fourteen (M.M.), and an additional count of sexual assault of a child under sixteen (K.H.). (ECF No. 14-2; ECF No. 14-3). Because of his prior conviction for lewdness with a minor, Hermanson faced a potential sentence of life without the possibility of parole if convicted of either count. *See* NRS § 200.366(4) (West 2013); NRS § 201.230(3) (West 2013). The risk of conviction on at least one count was high, because Hermanson admitted to law enforcement that he had touched M.M.'s genitalia. (ECF No. 15-1 at 125-27). Thus, to avoid a sentence of life without the possibility of parole, Hermanson accepted a plea deal that included a sentence of life with eligibility for parole after twenty-five years. (*Id.* at 184).

Faced with this evidence, the Nevada Court of Appeals reasonably concluded that there was no "reasonable probability [Hermanson] would have refused to plead guilty and would have proceeded to trial had counsel conducted further investigation or interviews of witnesses." (ECF No. 16-7 at 4). Indeed, even if counsel had conducted a more thorough investigation, Hermanson still would have faced a significant risk of conviction for lewdness with a child under fourteen based on his admissions to law enforcement. And, as explained above, a conviction on that count could have carried a sentence of life without the possibility of parole. The plea deal thus offered Hermanson a substantial benefit: the possibility of parole after twenty-five years, when

he would be in his mid-sixties. In these circumstances, a fairminded jurist could conclude that Hermanson failed to show that "a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372; *see also Mulder v. Schomig*, 384 F. App'x 666, 667 (9th Cir. 2010) ("Mulder has not shown prejudice from the alleged errors on the part of counsel because there is no reasonable probability that he would have elected to stand trial and risk consecutive life sentences without the possibility of parole where there was very little chance that a trial would have resulted in a better sentence than the one he received by pleading.").

Against this, Hermanson contends that his "statement to the police would not have led [him] to avoid a trial" because it "clearly was not voluntary" and he "had strong arguments to convince the jury to reject the statement." (ECF No. 54 at 10). But, as explained above, the circumstances surrounding Hermanson's statements provide no basis to conclude that they were involuntary. For all of these reasons, Hermanson is not entitled to relief on Ground 1(A).

**C.   Ground 3[4]**

In Ground 3, Hermanson alleges that his right to due process was violated because "the court did not have the legal authority to impose sentence" in the absence of a PSI. (ECF No. 21 at 20-21). At the sentencing hearing, Hermanson's counsel asked the court to "waive the PSI requirement," explaining that a PSI "would not benefit the sentencing hearing or the [c]ourt" because there was

---

[4] The Court addresses Ground 3 before Ground 2 because the facts relevant to the former claim provide background for the latter.

"only one sentence that can be given in this case"—life with the possibility of parole after twenty-five years. (ECF No. 14-8 at 6-7). The court then canvassed Hermanson about the waiver:

> THE COURT: You understand by statute you have a right to a preliminary sentence investigation report to be done before the Court sentences you?
>
> A    Yes, sir.
>
> THE COURT: All right. I'm just wondering, because we've been getting all of these cases coming down on the PSIs and the corrections and so forth, the prison will not take him without a PSI, right?
>
> PROBATION OFFICER: Your Honor, I think they will take him.
>
> THE COURT: As long as it's waived on the record?
>
> PROBATION OFFICER: Yeah. Because the mandatory psychosexual evaluation will be done at the prison anyway, because it's an A.
>
> THE COURT: So, Mr. Hermanson, you understand if you want, I will give you the opportunity to have that Presentence Investigation Report?
>
> A    Yes, sir, I do understand that.
>
> Q    And you've discussed the Presentence Investigation Report and its role in your sentencing with your attorney?
>
> A    Yes, sir.
>
> Q    All right. And do you have any questions about what the PSI does, or what the Presentence Investigation Report is used for?
>
> A    No, sir, I do not.
>
> Q    All right. Do you believe it's in your best interest at this point in time to waive your right to a Presentence Investigation Report and proceed to sentencing today?
>
> A    Yes, sir, I do.
>
> Q    All right. And is anyone threatening you to have you do that today?
>
> A    No, sir.
>
> Q    Has anyone promised you anything if you were to do that today?
>
> A    No, sir.
>
> Q    Okay. Do you wish any further time to think about this?
>
> A    No, sir.

> THE COURT: So the Court will find that the defendant is
> freely, voluntarily, and intelligently waiving his right
> to a Presentence Investigation Report, and asking the
> Court to sentence him today. We'll put that on the
> record.

(*Id.* at 14-16).

Following this colloquy, the court pronounced Hermanson guilty of sexual assault of a child under sixteen and sentenced him to "life in the Nevada State Prison with the possibility of parole at 25." (*Id.* at 16-17).

In affirming the denial of Hermanson's motion to correct an illegal sentence, the Nevada Supreme Court held:

> Appellant argues that his sentence is illegal
> because the district court did not have jurisdiction to
> impose a sentence for a sexual offense without a
> presentence investigation report. And because the
> district court did not have jurisdiction to impose the
> sentence, appellant argues that his due process rights
> were violated.

> A motion to correct an illegal sentence may only
> challenge the facial legality of the sentence: either
> the district court was without jurisdiction to impose a
> sentence or the sentence was imposed in excess of the
> statutory maximum. *Edwards v. State,* 112 Nev. 704, 708,
> 918 P.2d 321, 324 (1996). "A motion to correct an illegal
> sentence 'presupposes a valid conviction and may not,
> therefore, be used to challenge alleged errors in
> proceedings that occur prior to the imposition of
> sentence.'" *Id.* (quoting *Allen v. United States,* 495
> A.2d 1145, 1149 (D.C. 1985)). We conclude that the
> district court did not err in denying the motion because
> appellant failed to demonstrate that his sentence was
> facially illegal or that the district court lacked
> jurisdiction to impose a sentence.

> While NRS 176.135(2) provides that a presentence
> investigation report "[m]ust be made before the
> imposition of sentence" for a defendant convicted of a
> sexual offense, nothing in this statute precludes the
> defendant from waiving the preparation of a presentence
> investigation report. *See Krauss v. State,* 116 Nev. 307,
> 310, 998 P.2d 163, 165 (2000) ("Generally, a defendant
> is entitled to enter into agreements that waive or
> otherwise affect his or her fundamental rights."); *State
> v. Lewis,* 59 Nev. 262, 277, 91 P.2d 820, 825-26 (1939)
> ("This court has often held that one charged with crime
> may waive a statutory requirement."). Here, appellant
> requested to waive the presentence investigation report,

and the district court personally canvassed appellant to ascertain that he entered the waiver knowingly and voluntarily. The district court accepted the waiver and sentenced appellant to life with parole eligibility after 25 years, the only sentence available for the crime in this case. *See* NRS 200.366(3)(b) (providing for a sentence of life with the possibility of parole after 25 years for the crime of sexual assault on a child under the age of 16 years). At the most, imposition of a sentence without preparation of a presentence investigation report amounts to an error at sentencing, an error that does not implicate the district court's jurisdiction. *See* Nev. Const. art. 6, § 6(1); NRS 171.010; *Thomas v. State,* 88 Nev. 382, 384, 498 P.2d 1314, 1315-16 (1972) (recognizing the mandatory language in preparing a presentence investigation report, but holding that preparation of the report pursuant to NRS 176.145 was not jurisdictional); *see also United States v. Cotton,* 535 U.S. 625, 630 (2002) ("[T]he term jurisdiction means . . . the courts' statutory or constitutional *power* to adjudicate the case.") (emphasis in original) (internal quotations marks omitted)). We further conclude that the district court did not err in concluding that appellant invited the error, and he cannot now complain. *See Rhyne v. State,* 118 Nev. 1, 9, 38 P.3d 163, 168 (2002). And to the extent the presentence investigation report aids in parole consideration, classification, or other prison matters, the Division of Parole and Probation represented in earlier proceedings below that a postconviction report could be prepared as a substitute for a presentence investigation report. *See* Parole and Probation Division Directive Manual 6.3.124A ("[U]pon request of the Nevada Board of Parole Commissioners, the Division will conduct an investigation to provide the Parole Board with timely, relevant and accurate information concerning those felony-level case(s) where a Presentence Investigation Report was waived at the time of an offender/inmate sentencing."). Appellant's claim that his procedural due process rights were violated is without merit for the reasons discussed above.

(ECF No. 51-7).

The Nevada Supreme Court's rejection of Hermanson's due process claim was a reasonable application of clearly established federal law and was not based on an unreasonable application of the facts. Hermanson contends that he had a due process right to a PSI before being sentenced. (ECF No. 54 at 24-25). But even "the most basic rights of criminal defendants" are "subject to waiver."

*Peretz v. United States*, 501 U.S. 923, 936 (1991). A criminal defendant may waive his constitutional rights as long as there is clear and convincing evidence that the waiver was voluntary, knowing, and intelligent. *D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 187 (1972).

Applying these well-established principles, the Nevada Supreme Court reasonably concluded that Hermanson knowingly and voluntarily waived his right to a PSI. As noted above, the court explained to Hermanson that he had a "right" to have a PSI prepared before sentencing. (ECF No. 14-8 at 14). Hermanson then confirmed that (i) he had discussed the PSI and "its role in [his] sentencing" with his counsel, (ii) he believed it was in his best interest to waive his right to a PSI and proceed to sentencing, and (iii) he did not need "further time to think about this." (*Id.* at 14-16). Thus, even assuming that Hermanson had a due process right to a PSI, a fairminded jurist could conclude that he knowingly and voluntarily waived that right, and that therefore his due process claim lacked merit. *Cf. United States v. Shehadeh*, 962 F.3d 1096, 1102 n.4 (9th Cir. 2020) ("That even constitutional rights, such as the right to trial, are waivable further counsels in favor of our holding that defendant may waive preparation of a presentence report.").

Hermanson responds that his waiver was invalid because his counsel mistakenly stated during sentencing that he could "get the PSI when he's in prison." (ECF No. 14-8 at 7). As the Nevada Supreme Court explained, however, "the Division of Parole and Probation represented in earlier proceedings . . . that a postconviction report could be prepared as a substitute for a

presentence investigation report." (ECF No. 51-7 at 3). Moreover, although Hermanson claims that a postconviction report may not "fully alleviate th[e] danger" that he "will never be able to go before the parole board due to the absence of the PSI," he provides no evidence to support this assertion. (ECF No. 54 at 28-29). Thus, there is no basis to conclude that counsel's allegedly mistaken statement about the possibility of "get[ting] the PSI" in prison rendered Hermanson's waiver involuntary or unknowing. Hermanson is not entitled to relief on Ground 3.

### D.   Grounds 2, 4, and 5

This Court previously held that Grounds 2, 4, and 5 were technically exhausted but procedurally defaulted. (ECF No. 43 at 7). The Court deferred ruling on whether Hermanson could excuse the default of those grounds until the merits disposition. (*Id.*) Hermanson now contends that he can show cause and prejudice to excuse the default of Grounds 2, 4, and 5 under *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 54 at 19-23, 30-33).

Where a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To demonstrate cause, the petitioner must establish that some external and objective factor impeded efforts to comply with the state's procedural rule. *E.g.*, *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Hiivala v. Wood*, 195 F.3d. 1098, 1105 (9th Cir.

1999). "[T]o establish prejudice, [a petitioner] must show not merely a substantial federal claim, such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his actual and substantial disadvantage.'" *Shinn v. Ramirez*, 142 S. Ct. 1718, 1733 (2022) (citing *Carrier*, 477 U.S. at 494, 106 S. Ct. 2639 and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

The Supreme Court has provided an alternative means to satisfy the cause requirement for purposes of overcoming a procedural default for an ineffective-assistance-of-trial-counsel claim where a petitioner can show that he received ineffective assistance of counsel in his initial state habeas proceeding. *Martinez*, 566 U.S. at 9. The Supreme Court outlined the necessary circumstances as follows:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18).

A procedural default will not be excused if the underlying ineffective-assistance claim "is insubstantial," i.e., lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court cited the standard for issuing a

certificate of appealability as analogous support for whether a claim is substantial. 566 U.S. at 14. A claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.

For the reasons explained below, the Court concludes that *Martinez* does not excuse the default of Grounds 2, 4, and 5 because Hermanson's underlying ineffective-assistance claims are not "substantial."

### 1. Ground 2

In Ground 2, Hermanson alleges that his counsel provided ineffective assistance by "inducing [him] to plead guilty on the promise he could be sentenced without a PSI." (ECF No. 54 at 19). According to Hermanson, this promise was "illegal" because the court could not sentence him "without a PSI first being prepared." (*Id.* at 20). Hermanson contends that he chose to plead guilty in part because he was receiving inadequate treatment for his mental health issues at the Lyon County Jail, and his counsel told him that sentencing would be "expedite[d]"—and he would be sent to prisoner sooner—if he waived preparation of a PSI. (*Id.* at 21-22). Thus, Hermanson argues, if his counsel "had not made this promise," he "would not have accepted the deal and would have proceeded to trial." (*Id.* at 21).

Ground 2 does not raise a "substantial" ineffective-assistance claim because Hermanson has failed to establish that his counsel performed deficiently. *Martinez*, 566 U.S. at 14. To demonstrate deficient performance, a petitioner "must show that

counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The question is whether, under "prevailing professional norms," counsel's "assistance was reasonable considering all the circumstances." *Id.* There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and in assessing counsel's performance, courts must make every effort "to eliminate the distorting effects of hindsight." *Id.* at 689.

Here, Hermanson's counsel allegedly advised him that he could be sentenced without a PSI. Hermanson was, indeed, sentenced without a PSI after he knowingly and voluntarily waived his right to have that document prepared before sentencing. (ECF No. 14-8 at 14-17). Contrary to Hermanson's assertion, counsel's "promise" that he could be sentenced without a PSI was not "illegal." The alleged illegality of this promise rests on Hermanson's contention that the court "simply did not have the authority" to sentence him without a PSI. (ECF No. 54 at 20). That contention is incorrect. As noted above, the Nevada Supreme Court ruled that "nothing in th[e] [relevant] statute precludes [a] defendant [such as Hermanson] from waiving the preparation of a presentence investigation report." (ECF No. 51-7 at 2). Because counsel's advice was a correct statement of Nevada law, Hermanson cannot demonstrate deficient performance. Thus, Ground 2 does not raise a "substantial" ineffective-assistance claim, and Hermanson cannot rely on *Martinez* to overcome the default of this claim.

### 2.   **Ground 4**

In Ground 4, Hermanson alleges that his counsel provided ineffective assistance because he had a conflict of interest. (ECF

No. 54 at 30). In 2002, Hermanson's counsel represented M.M.'s biological father in an abuse-or-neglect case under NRS Chapter 432B. (ECF No. 15-1 at 88, 185-86). Specifically, Child Protective Services took M.M. away from her father and "awarded her to the State." (*Id.* at 88). Hermanson's counsel subsequently represented M.M.'s father as a "public defender" in the abuse-or-neglect case. (*Id.*) At the state postconviction evidentiary hearing, Hermanson's counsel testified that he believed M.M.'s father "worked the case plan" and that the case was ultimately "closed." (*Id.* at 186). The record does not include any additional information about the case.

Hermanson contends that, in representing M.M.'s father in the abuse-or-neglect case, counsel "invariably argued that the child would be safe in the father's custody." (ECF No. 54 at 30). Thus, according to Hermanson, counsel "had to consider" M.M.'s welfare during his representation of her father. (*Id.*) That allegedly "conflict[ed] with [counsel's] obligations in this case where he was representing a defendant who had been accused of harming that same child." (*Id.*)

Ground 4 fails to raise a "substantial" ineffective-assistance claim because there is no basis to conclude that the alleged conflict adversely affected counsel's performance. *Martinez*, 566 U.S. at 14. The right to counsel includes the right to assistance by a conflict-free attorney. *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978)). "[T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual

conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350. An "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 175 (2002).

To establish an "adverse effect," a defendant must prove "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005). In other words, "[t]o establish that a conflict of interest adversely affected counsel's performance, the defendant need only show that some effect on counsel's handling of particular aspects of the [case] was 'likely.'" *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992). Thus, "[w]hen faced with a defendant's claim that her counsel operated under an actual conflict, [t]he central question that we consider in assessing a conflict's adverse effect is what the advocate [found] himself compelled to refrain from doing because of the conflict." *United States v. Walter-Eze*, 869 F.3d 891, 901 (9th Cir. 2017) (internal quotation marks and citation omitted).

Hermanson fails to establish that the alleged conflict "significantly affected counsel's performance." *Mickens*, 535 U.S. at 172-73. Hermanson points to two "errors by counsel" that allegedly stemmed from the conflict of interest: counsel's "illegal" promise that Hermanson could be sentenced without a PSI, and his failure to investigate the case. (ECF No. 54 at 30). As to the first alleged error, Hermanson's counsel correctly advised him

that he could be sentenced without a PSI. Because counsel provided an accurate statement of Nevada law, the Court cannot conclude that the alleged conflict "adversely affected" his performance in this respect. *Cuyler*, 446 U.S. at 350.

As to the second alleged error, Hermanson has failed to establish that counsel's handling of the investigation was "likely" attributable to the conflict. *Miskinis*, 966 F.2d at 1268. At the state postconviction evidentiary hearing, Hermanson's counsel explained that he had spoken to several potential witnesses, but that the information they provided was not "very helpful in this case." (ECF No. 15-1 at 182-84). For example, counsel acknowledged receiving a written statement from Raymond McClory stating that he "didn't see Mr. Hermanson ever do anything with the kids" and "didn't believe they were ever left alone with him." (*Id.* at 171). Counsel explained, however, that "everybody else"—including Jody Martin—said that "at times" Hermanson was "left alone" with the victims. (*Id.*)

Counsel also acknowledged that Cecilia Gilland had mentioned her conversation with K.H., in which the victim allegedly said that Hermanson "had never hurt her, and that he never could." (*Id.* at 60-61, 183-84). According to counsel, however, by the time he received this information, Hermanson had already told him he wanted to plead guilty. (*Id.* at 184). That decision was prompted in large part by Hermanson's desire to avoid a sentence of life without the possibility of parole—a substantial risk given that Hermanson had admitted to law enforcement that he had touched M.M.'s genitalia. (*Id.* at 125-27, 184). In these circumstances, there is no basis to conclude that "some plausible alternative defense strategy or

tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to [counsel's] other loyalties or interests." *Wells*, 394 F.3d at 733. Accordingly, Hermanson's ineffective-assistance claim is not "substantial," and *Martinez* does not excuse the default of Ground 4.

### 3.   Ground 5

In Ground 5, Hermanson alleges that his counsel rendered ineffective assistance by (i) mistakenly informing him that, because he pled guilty, "he was not entitled to bring an appeal"; and (ii) failing to file a notice of appeal to "preserve [his] right to appeal." (ECF No. 54 at 32-33). Hermanson contends that his counsel's advice was incorrect because, under Nevada law, a guilty plea "does not foreclose an appeal," but instead limits the issues that can be raised on appeal to "constitutional, jurisdictional, or other grounds challenging the legality of the proceedings." (*Id.* at 32 (citing NRS § 177.015(4))). According to Hermanson, but for his counsel's mistaken advice, he would have brought a direct appeal challenging "the court's legal authority to impose a sentence without a" PSI. (*Id.*)

Ground 5 fails to raise a "substantial" ineffective-assistance claim. *Martinez*, 566 U.S. at 14. The *Strickland* "test applies to claims . . . that counsel was constitutionally ineffective for failing to file a notice of appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). To establish deficient performance under *Flores-Ortega*, a petitioner must make one of the following showings: (i) that counsel "fail[ed] to follow the defendant's express instructions with respect to an appeal"; (ii)

that "a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)" and counsel did not consult with the defendant about appealing; or (iii) that the defendant "reasonably demonstrated to counsel that he was interested in appealing" and counsel did not consult with the defendant. *Id.* at 478, 480. "Consult," in this context, "means advising the defendant about the advantages and disadvantages of taking an appeal and making a reasonable effort to discover the defendant's wishes." *Id.* at 471.

To show prejudice, the petitioner "must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. "[E]vidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant in making this determination." *Id.* at 485. Although "the performance and prejudice prongs may overlap, they are not in all cases coextensive." *Id.* at 486. Specifically, "[t]o prove deficient performance, a defendant can rely on evidence that he sufficiently demonstrated to counsel his interest in an appeal. But such evidence alone is insufficient to establish that, had the defendant received reasonable advice from counsel about the appeal, he would have instructed his counsel to file an appeal." *Id.*

Hermanson's ineffective-assistance claim is insubstantial because he fails to show that, but for his counsel's allegedly deficient conduct, he would have appealed.[5] First, as explained

---

[5] The Court assumes, without deciding, that Hermanson's counsel failed to "consult" with him about an appeal within the meaning of *Flores-Ortega*.

above, Hermanson pled guilty in large part to avoid the very real possibility of receiving a sentence of life without the possibility of parole. (ECF No. 15-1 at 184). The plea agreement gave Hermanson a substantial benefit—the prospect of getting out of prison during his lifetime. (ECF No. 14-9). Second, Hermanson fails to point to any nonfrivolous grounds for appeal. He claims that he would have argued on direct appeal that the court could not sentence him without a PSI. (ECF No. 54 at 32). But, as the Nevada Supreme Court later held, the law permitted the court to sentence Hermanson without a PSI given his waiver of that requirement, and Hermanson could not raise the issue on appeal in any event because he asked the court to forgo a PSI and proceed with sentencing. (ECF No. 51-7). In these circumstances, Hermanson has not established that, had he "received reasonable advice from counsel about the appeal, he would have instructed his counsel to file an appeal." *Flores-Ortega*, 528 U.S. at 486.

Accordingly, because Hermanson has failed to satisfy the prejudice prong, his ineffective-assistance claim is not substantial, and *Martinez* does not excuse the default of Ground 5.[6]

**E.    Certificate of Appealability**

This is a final order adverse to Hermanson. Rule 11 of the

---

[6] Hermanson requests that the Court conduct an evidentiary hearing. (ECF No. 21 at 25). But he fails to explain what evidence would be presented at such a hearing. Furthermore, the Court has already determined that Hermanson is not entitled to relief, and neither further factual development nor any evidence that may be offered at an evidentiary hearing would affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also* 28 U.S.C. § 2254(e)(2). Thus, Hermanson's request for an evidentiary hearing is denied.

Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability. Therefore, the Court has *sua sponte* evaluated the claims in the second amended petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate (i) whether the petition states a valid claim of the denial of a constitutional right and (ii) whether this Court's procedural ruling was correct. *Id.*

Applying these standards, the Court finds that a certificate of appealability is unwarranted.

**IV. CONCLUSION**

IT THEREFORE IS ORDERED that Hermanson's second amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 21) is DENIED.

IT FURTHER IS ORDERED that Hermanson is DENIED a certificate of appealability.

IT FURTHER IS ORDERED that the Clerk of the Court shall substitute Fernandies Frazier for Respondent Isidro Baca.

/

1      IT FURTHER IS ORDERED that the Clerk of the Court shall enter

2  judgment accordingly and close this case.

3      DATED: this 12th day of December, 2022.

_____
HOWARD D. MCKIBBEN
UNITED STATES DISTRICT JUDGE